Filed 12/14/18

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B270877 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA394495) |
| v. | |
| HSIU YING LISA TSENG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge. Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, and David Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion *post*, parts II-VII.

Defendant and appellant Hsiu Ying Lisa Tseng, a physician, appeals from the judgment entered upon her convictions of three counts of second degree murder, 19 counts of unlawfully prescribing controlled substances, and one count of obtaining a controlled substance by fraud. She contends that substantial evidence did not support the murder convictions and that the trial court erred in (1) admitting evidence of six uncharged patient deaths; (2) failing to unseal and quash a search warrant of her financial records; (3) failing to grant a mistrial based on prosecutorial misconduct; (4) reopening closing argument; and (5) failing to apply Penal Code[1] section 654 to the murder conviction sentences. None of her arguments are meritorious. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  *Tseng's Medical Clinic and Practice*

In approximately 2007, Tseng, a licensed physician practicing internal medicine and osteopathy, joined Advance Care AAA Medical Clinic (the clinic) in Rowland Heights, a general medical practice operated by her husband. When Tseng first joined the clinic, the patients came from the local Hispanic and Asian communities, the wait time for each patient was 15 to 30 minutes and 90 percent of the patients paid for treatment through their insurance.

By 2008, the practice and the clientele of the clinic had changed. Most of Tseng's patients were now white males in their

---

[1] All statutory references are to the California Penal Code unless otherwise indicated.

[2] This case involved a six-week trial on two dozen criminal charges relating to Tseng's medical practice and prescriptions of controlled substances. We include only the facts and evidence relevant to the issues on appeal.

20's and 30's who came from outside Los Angeles County seeking pain and anxiety management medications. By 2010, the clinic had developed a reputation as a place where patients could easily obtain prescriptions for controlled substances, including opioids, sedatives, muscle relaxants, and drugs used to treat drug addiction. In addition, fees had doubled, and nearly all patients paid in cash.[3] The clinic's income increased from $600 a day in cash to $2,000 to $3,000 per day.[4]

According to one visitor, the clinic looked "like a parole office" with "drug dealing." The wait time for Tseng's patients also increased to about six hours with 20-30 patients inside the waiting room or outside the clinic at any one time. Some patients appeared to be under the influence of drugs or suffering from drug withdrawals, and one patient overdosed in the waiting room. When G.R., the clinic's receptionist, expressed concern about the number of patients waiting and the level of anxiety and agitation they expressed in the waiting room, Tseng told her that they were "druggies" and could wait.

### B. Tseng's Treatment and Prescribing Methods Beginning in 2008

Tseng spent about 10 to 15 minutes with new patients and five minutes with them on return visits. Often she would see two or three unrelated patients in the same examination room at the same

---

[3] Tseng also charged $5 to "split" a prescription. "Splitting" is a practice of writing a prescription on two different prescription forms so that a patient could fill the prescription on different dates or at different pharmacies.

[4] It appears that the clinic's earnings grew during this time because of the increase in fees charged for services and in the number of patients treated on a daily basis.

time. Tseng would often undertake no (or only a cursory) medical examination of her patients; patients for whom she would prescribe pain medications often expressed nonspecific complaints about anxiety and pain from old injuries. Many times, she did not obtain an adequate medical history or prior medical records before prescribing medications. For example, she did not do drug testing or review the California's Controlled Substance Utilization Review and Evaluation System (CURES) database[5] to determine whether patients had current or prior prescriptions for controlled substances from other doctors. Tseng routinely wrote prescriptions for opioids (such as oxycodone, oxymorphone, fentanyl, and hydrocodone),[6] sedatives (such as promethazine and benzodiazepine),[7] muscle relaxants (such as carisoprodol, which is sold under the brand name Soma®), and amphetamines, as well as controlled substances used to treat drug and opioid addictions (such as methadone and

---

[5] CURES collects prescription dispensation information for all controlled substance prescriptions written in the State of California for individual patients. By referring to the CURES database, a doctor may determine when and from whom a particular patient has obtained a prescription for a controlled substance. This can reveal whether the patient may be abusing controlled substances by obtaining prescriptions for the same drug from multiple doctors.

[6] Branded formulations of oxycodone are sold under the brand names OxyContin® or Roxicodone®; branded formulations of oxymorphone are sold under the brand names Opana® or Opana ER®; and branded formulations of the drug hydrocodone are sold under the brand names Norco®, Vicodin®, or Lortab®.

[7] Tseng prescribed a benzodiazepine drug sold under the names alprazolam and Xanax®.

buprenorphine/naloxone).[8]  Tseng sometimes allowed patients to pick up prescriptions for other patients who were not at the clinic. The evidence presented at trial showed that on at least one occasion Tseng prescribed a patient's relative, who had never been Tseng's patient, a controlled substance.  Tseng acknowledged that some patients, who presented symptoms suggesting opioid and drug addiction and withdrawal, were merely seeking drugs.

C.    *Investigations of Tseng's Practice*

Beginning in 2008, pharmacists began to refuse to fill prescriptions written by Tseng because the prescriptions raised "red flags"; the patients' profiles, conduct, and the combination of substances and quantities Tseng prescribed indicated no legitimate medical purpose for writing the prescriptions.  When Tseng learned of this, she referred her patients to "mom and pop" pharmacies, which continued to fill her prescriptions.  That same year, law enforcement investigators, including investigators from the coroner's office, began calling Tseng to discuss the deaths of several of her patients and to apprise her that the patients had died of suspected drug overdoses shortly after obtaining prescriptions from her.  Once she became aware of the deaths, she entered "alerts" in some of the patients' records indicating that they had died from a possible drug overdose.  She also altered[9] patient

---

[8]  The United States Drug Enforcement Agency (DEA) had not licensed Tseng to prescribe drugs to treat addiction.

[9]  During this period, the clinic began using digital patient records that allowed Tseng to enter medical information, including "alerts" in a patient file to convey information to a receptionist about a patient.  According to G.R., until authorities began investigating the clinic and requesting information about Tseng's patients, many patient records were incomplete or blank.  In fact, the digital copies of medical records obtained in 2010 by

records but continued her prescribing practices until she was arrested in 2012.

In 2010, the DEA and California Department of Justice (DOJ) investigated Tseng for diversion of drugs. DEA agents executed a search warrant at Tseng's medical group. Agents seized computers and created digital copies of her computer files. In 2012, the Medical Board of California (the Medical Board) also executed a search warrant on Tseng's medical group, seizing patient records. Evidence produced during the investigation revealed that from 2007 through 2010, the clinic's gross receipts were approximately $5,000,000.

## D.    *Tseng's Patients' Overdose Deaths*

In July 2012, Tseng was arrested and charged with three counts of second degree murder (§ 187 (count 1, Vu Nguyen; count 2, Steven Ogle; and count 4, Joseph Rovero)), 20 counts of unlawfully prescribing controlled substances to patients (Health & Saf. Code, § 11153, subd. (a) (count 3 & counts 5-23)), and one count of obtaining a controlled substance by fraud (Health & Saf. Code, § 11173, subd. (a) (count 24)).

At trial, the prosecution presented evidence that from September 2007 to December 2009, nine of Tseng's patients— ranging from 21 to 34 years of age—died shortly after filling the prescriptions Tseng wrote them for controlled substances.

---

law enforcement from Tseng's office computers contained few exam notes for patients who had died from drug overdoses; however, the same records seized by authorities in 2012 for the same office visits revealed extensive exam notes, indicating that Tseng had altered the records while she was under investigation.

### 1. *Murder charges*

##### a. *Death of Vu Nguyen (count 1—second degree murder) in 2009*

In early February 2009, Tseng prescribed 28-year-old Nguyen the sedative Xanax®, and the opioids Norco® and Opana®.[10]  Nguyen died several days later of a drug overdose. Nguyen's family did not believe he suffered from any medical condition that required him to take painkillers.  The Orange County Coroner's Division conducted Nguyen's autopsy and determined the cause of his death was the combined effects of Opana® and Xanax®, although he had methadone in his system as well.[11]

On March 9, 2009, the coroner's investigator contacted Tseng to discuss Nguyen's death.  Tseng told the investigator she started treating Nguyen on August 9, 2008, for back and neck pain.  She prescribed the opioid Norco® and sedative Xanax®.[12] Two weeks later, Nguyen returned and said he had taken all of the medication because the pain was "too much."  Tseng wrote him a refill prescription.  Although Tseng claimed she told Nguyen she would not write refill prescriptions for his medications "early" again, she failed to discuss with him the potential health risks of Norco® and Xanax®.  Nguyen returned to Tseng at the beginning of

---

[10]  On February 7, 2009, Tseng prescribed Nguyen:  Xanax® (2 mg, 90 tablets); Norco® (10 mg, 90 tablets); and Opana® (10 mg, 90 tablets).

[11]  Tseng never prescribed Nguyen methadone.

[12]  The record does not contain evidence of the doses or number of pills of Norco® or Xanax® that Tseng initially prescribed Nguyen.

November 2008 and said the medications were not working. Tseng prescribed the opioid Opana®, which is three times stronger than Norco®, and wrote him a refill prescription for Xanax®. During that visit, Nguyen also told Tseng that he had Attention Deficit Disorder and reported he was having trouble concentrating. Tseng did not attempt to corroborate the diagnosis of Attention Deficit Disorder; nonetheless, Tseng prescribed him Adderall®.[13] Nguyen returned on December 1, and Tseng prescribed Vicodin®,[14] Opana®, and Xanax® for him. Nguyen returned on January 5, 2009, and reported that the Vicodin® was not strong enough. Tseng prescribed Nguyen a higher dose of the opioid Norco® (10 mg, 90 tablets), and gave him refill prescriptions for the opioid Opana® (10 mg, 90 tablets) and the sedative Xanax® (2 mg, 90 tablets). A month later, at Nguyen's last visit, Tseng wrote those refill prescriptions for the same dose and number of pills. Tseng told the coroner's investigator that Nguyen was always seeking more medication and stronger doses.

The prosecution also presented evidence that Tseng did not obtain information from Nguyen to corroborate his complaints of pain and anxiety or complete an adequate physical examination to determine whether a legitimate medical reason existed to prescribe the controlled substances. In addition, although Nguyen reported to Tseng that he was taking "high doses of opioids" prescribed by other doctors, Tseng did not contact Nguyen's other doctors. Tseng did not obtain medical records relating to Nguyen's prior treatment or a complete medical and mental health history of Nguyen.

---

[13] Adderall® is the brand name of an amphetamine drug commonly prescribed to treat the symptoms of Attention Deficit Disorder.

[14] The opioid Vicodin® is a hydrocodone opioid of the same degree of strength as the hydrocodone opioid Norco®.

Tseng's medical records pertaining to Nguyen showed that Tseng had not provided a treatment plan for Nguyen, nor had she educated him about alternative treatments for his symptoms or the potential risks of the substances she prescribed. In addition, the prosecution presented evidence that Tseng had altered Nguyen's patient records between 2010 and 2012 by filling in information in his records that she had left incomplete while she was treating Nguyen.

The prosecution's medical expert testified that Tseng's treatment of Nguyen represented an extreme departure from the standard of medical care.

> b.  *Death of Steven Ogle (count 2—second degree murder; count 3—unlawful prescription) in 2009*

Steven Ogle, who lived in Palm Springs, sought treatment from Tseng in early March 2009, complaining of pain caused by a car accident that had occurred several years before. According to Tseng's patient records for Ogle, during his first visit to Tseng's clinic on March 2, 2009, he told Tseng he was taking six to eight OxyContin® tablets (80 mg) per day,[15] using heroin, and that he wanted to take methadone. Tseng did not ask who had prescribed Ogle the OxyContin®. Even though Tseng was not an addiction specialist licensed to prescribe and monitor the use of methadone, she wrote Ogle prescriptions for methadone (10 mg, 100 tablets)

---

[15] According to expert testimony presented at trial, an 80 milligram dose of OxyContin® is an amount typically prescribed to a terminal cancer patient. There was no evidence Ogle was suffering from cancer.

9

and Xanax® (2 mg, 100 tablets).**16**  Ogle returned to the clinic two weeks later on March 17, 2009, having used all of the medication and suffering from symptoms of withdrawal.  Tseng wrote refill prescriptions for Ogle.  On April 7, again having used all the medications prescribed on March 17 and suffering from withdrawal symptoms, Ogle returned to the clinic for more prescriptions.  Tseng again prescribed Xanax® (2 mg, 100 tablets) and methadone (10 mg, 100 tablets).  Ogle died two days later.  Investigators found three bottles of prescription medication near Ogle's body.  Tseng had written prescriptions for two of these only two days earlier: methadone, 100 tablets (7 remaining) and Xanax®, 100 tablets (15.5 remaining).  The third bottle, containing OxyContin®, had been prescribed in January 2009 by another doctor.  The coroner opined that Ogle died of "methadone intoxication."

In early May 2009, a coroner's investigator called Tseng regarding Ogle.  Tseng confirmed that Ogle's first visit was in March 2009, about a month before his death.  She said that Ogle reported he was abusing OxyContin® and wanted her help to stop, and therefore she prescribed methadone and Xanax®.  Tseng said she saw Ogle again two weeks later and wrote him refill prescriptions.  Tseng confirmed he returned in early April and she

---

**16**  Ogle's sister-in-law accompanied him on visits to the clinic.  She testified it was her belief that at Ogle's first visit on March 2, 2009, Tseng prescribed Ogle:  OxyContin®, Xanax®, and the sedative promethazine.  She also testified that at Ogle's second visit in mid-March, she believed that Tseng wrote refill prescriptions and also prescribed methadone.  Tseng's patient records for Ogle do not indicate that she prescribed him OxyContin® or promethazine.  Likewise, when Tseng spoke to the coroner's investigator in May 2009, after Ogle's death, Tseng did not mention prescribing Ogle OxyContin® or promethazine.

wrote Ogle refill prescriptions again.  She claimed that she told Ogle not to take methadone with other opioids.

The prosecution presented expert medical testimony that Tseng's method of treatment of Ogle represented an extreme departure from the standard of care in various ways, including that Tseng was not a licensed addiction specialist and did not have the training to monitor Ogle's use of methadone.

        c.      *Death of Joseph Rovero (count 4—second degree murder; count 5—unlawful prescription) in 2009*

In 2009, Rovero was a 21-year-old student at Arizona State University, who traveled from Arizona seeking treatment at Tseng's clinic.  Tseng saw Rovero only once, on December 9, 2009, to treat his complaints of back pain, wrist pain, and anxiety. Rovero informed Tseng he had been using high doses—six pills (150 mg to 200 mg) of OxyContin® and Xanax® and the muscle relaxant Soma®—every day and requested the same prescriptions. Tseng prescribed him the opioid Roxicodone® (30 mg, 90 tablets), Soma® (350 mg, 90 tablets), and Xanax® (2 mg, 30 tablets). Nine days later, when Rovero died of a drug overdose, empty bottles of medications prescribed by Tseng were found near his body.  The coroner in Arizona investigating Rovero's death found the cause of death was combined drug toxicity, including alcohol,[17] prescription opioids, muscle relaxants (Soma®), and a sedative (Xanax®).

When investigators questioned Tseng about Rovero's death, she admitted treating Rovero and knowing that he had been using opioids, sedatives, and muscle relaxants prescribed by other

_____

[17] The amount of alcohol in Rovero's blood at the time of his death was a non-lethal amount.

doctors. She told investigators that she believed Rovero was taking an inappropriate amount of OxyContin®. Consequently, she prescribed Roxicodone® instead, as well as Xanax® and Soma®. Her stated goal was to wean Rovero from opioids. Tseng did not, however, verify the doses or the types of medications that Rovero claimed other doctors had previously prescribed him. Tseng reduced the doses of all three drugs Rovero reported taking by 80 percent, which, according to the evidence presented at trial, guaranteed he would suffer from withdrawals. The prosecution's expert explained that when an individual has been abusing pain medications by taking high doses of the medications—as Rovero was—any efforts to "wean" the person from those drugs require a gradual reduction in dosing; otherwise, the individual might experience symptoms of drug withdrawal that place the individual at risk of overdose or death. The prosecution also presented evidence that the prescriptions Tseng wrote for Rovero likely increased his potential for overdose and death because Tseng failed to verify the doses of the drugs he had been previously prescribed.

## 2.    *Uncharged deaths of Tseng's patients*

During the trial, in addition to the deaths of Nguyen, Ogle, and Rovero, the prosecution presented evidence of the following six uncharged deaths of Tseng's patients from prescription drug overdoses between late 2007 and 2009: Matthew Stavron, Ryan Latham, Nathan Keeney, Joshua Chambers, Joseph Gomez, and Michael Katnelson.

Specifically, with respect to patient Stavron, who died in 2007, Tseng prescribed to him, among other drugs, OxyContin® (80 mg). During the DEA's investigation of Tseng's practice, she told an undercover DEA agent that an 80 milligram prescription of OxyContin® is "super high." She was also aware that OxyContin®

is primarily prescribed only to treat pain from broken bones or cancer, and that Stavron did not suffer pain from broken bones or cancer. Two days after Tseng wrote Stavron a prescription for OxyContin®, he died from an overdose of that medication. When the coroner's investigator called Tseng to discuss Stavron's death, she told the investigator that Stavron was drug-seeking.

Tseng's patients Latham and Keeney died in 2008. Tseng had prescribed Latham Norco® (10 mg, 150 tablets), in addition to other drugs. As Tseng told an undercover DEA agent, Norco® is addictive and "evil." Two days after Tseng wrote Latham the prescription, he died from a Norco® overdose. During a call with the coroner's investigator, Tseng described the number of Norco® pills Latham took per day and characterized him as a "drug-seeker."

Tseng prescribed Keeney OxyContin® (80 mg, 60 tablets). There was no indication that Keeney had broken bones or cancer. Tseng also prescribed to him methadone (10 mg, 100 tablets). Four days after filling the prescriptions from Tseng, Keeney died from a methadone and OxyContin® overdose. Tseng told the coroner's investigator that Keeney had "somewhat drug-seeking behavior."

Tseng was aware of Stavron's and Latham's overdose deaths *before* she started treating murder victim Nguyen, and learned of Keeney's death while she was treating Nguyen. In addition, by the time that murder victim Ogle died in April 2009, Tseng had also learned of Nguyen's death.

In 2009, Tseng's patients Chambers, Gomez, and Katnelson[18] also succumbed to drug overdoses. Specifically, concerning Katnelson, Tseng prescribed him fentanyl (10 of the 75 mcg-

---

[18] Tseng was charged with issuing unlawful prescriptions with respect to Chambers (count 8), Gomez (count 10), and Katnelson (count 13).

per-hour patches). Fentanyl is an opioid 100 times more potent than morphine. Katnelson died the day after he filled the prescription from Tseng. Tseng told the coroner's investigator that she did not know Katnelson well enough to know whether he was abusing the medication.

Tseng prescribed Chambers, among other drugs, Norco® (10 mg, 100 tablets); Chambers died three days later. The coroner determined Chamber's cause of death was a combination of drugs, including Norco®. Tseng told the coroner's investigator that Chambers appeared to be drug-seeking because he finished his drugs early and because his insurance company apprised her that Chambers was seeking medication from other doctors. She also reported that she suspected Chambers was abusing alcohol.

Tseng prescribed Gomez, among other drugs, the opioid Roxicodone® (30 mg, 90 tablets) and Xanax® (2 mg, 100 tablets); two days later, Gomez died. The coroner determined he died of a combined intoxication, including Roxicodone® and Xanax®. Tseng told the coroner's investigator that Gomez attempted to get medication from other doctors.

Tseng learned of the drug overdose deaths of Chambers, Gomez, Katnelson, and Ogle *before* she began treating murder victim Rovero in December 2009.

Similar to the deaths of the patients in the charged murder counts—Nguyen, Ogle, and Rovero—the six uncharged patient deaths of Stavron, Latham, Keeney, Chambers, Gomez, and Katnelson all occurred within days after Tseng wrote them prescriptions for high doses of opioids, sedatives, or other drugs. These patients—Stavron, Latham, Keeney, Chambers, Gomez, and Katnelson—also fit the same patient profile as Nguyen, Ogle, and Rovero. They were in their 20's or early 30's, and Tseng knew they were drug-seeking and drug-abusing. Tseng treated some of

14

these patients only once while others returned several times; each time, Tseng prescribed high doses of controlled substances. Moreover, after the coroner's investigators contacted Tseng to inform her when each patient had died from a drug overdose, Tseng entered an "alert" in the clinic's computer records for some of those patients, indicating the patient had died from a possible drug overdose. A comparison of the patient records seized in 2010 and 2012 also showed that Tseng had altered patient records, while she was under investigation, by completing records that had been previously left blank or incomplete.

Even after Tseng learned of these deaths, she continued to prescribe high doses of controlled substances, including opioids, sedatives, and in some cases, methadone to other patients.

A jury found Tseng guilty of three counts of second degree murder, 19 counts of unlawfully prescribing controlled substances, and one count of obtaining a controlled substance by fraud. The trial court sentenced her to 30 years to life in state prison. Tseng filed a timely notice of appeal.

15

## DISCUSSION

### I. Substantial Evidence Supports Tseng's Second Degree Murder Convictions

Tseng contends that substantial evidence does not support her convictions of second degree murder of Nguyen, Ogle, and Rovero because there was no evidence that she acted with implied malice, and, in the case of Nguyen and Rovero, no evidence that her conduct was the proximate cause of their deaths. She argues that although she acted with negligence sufficient to support convictions for involuntary manslaughter, there was no evidence that she acted with conscious disregard for her patients' lives. Specifically, she asserts that because coroner and police investigators never informed her that she was responsible for the victims' deaths or the deaths of other patients, her continued practice of prescribing high doses and large quantities of opioids and other controlled substances did not show the necessary reckless mindset to support a finding of implied malice.

We review the evidence in the light most favorable to the verdicts, presuming the existence of every fact the trier could have reasonably deduced from the evidence. (*People v. Johnson* (1993) 6 Cal.4th 1, 38, overruled on other grounds by *People v. Rogers* (2006) 39 Cal.4th 826.) We apply the same standard to our review of circumstantial evidence. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) As set forth below, we conclude that substantial evidence supports the jury's verdict.

#### A. *Evidence of Implied Malice*

Implied malice exists when an intentional act naturally dangerous to human life is committed " 'by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Lasko* (2000) 23 Cal.4th

16

101, 107, quoting Pen. Code, § 188.) "It is the ' " 'conscious disregard for human life' " ' that sets implied malice apart from gross negligence."[19] (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954.) "Implied malice is determined by examining the defendant's subjective mental state to see if . . . she actually appreciated the risk of . . . her actions." (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697 (*Costa*); see *People v. Olivas* (1985) 172 Cal.App.3d 984, 988 ["[T]he state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' "].) "Implied malice may be proven by circumstantial evidence." (*Costa, supra,* 183 Cal.App.4th at p. 697; see *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110 ["Even if the act results in a death that is accidental . . . the circumstances surrounding the act may evince implied malice."].)

The record discloses overwhelming evidence that Tseng's treatment of Nguyen, Ogle, Rovero, and other patients was well below the standard of care in the practice of medicine and prescribing opioid medications. We recognize that, although probative of Tseng's subjective appreciation of risk, a departure from the medical standard of care alone would not be sufficient to support an implied malice finding. (See *People v. Klvana* (1992)

---

[19] Second degree murder (based on implied malice) and involuntary manslaughter both involve a disregard for life. For murder, however, the disregard is judged by a subjective standard, whereas for involuntary manslaughter, the standard is an objective one. (*People v. Watson* (1981) 30 Cal.3d 290, 296–297.) Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. (*Ibid.*) In contrast, involuntary manslaughter merely requires a showing that "a reasonable person would have been aware of the risk." (*Id.* at p. 297.)

11 Cal.App.4th 1679, 1703-1705 [even though the evidence showed that doctor's treatment of patients fell below the standard of care, his second degree implied malice murder convictions were affirmed not based on the evidence of the doctor's negligence but, instead, because sufficient evidence demonstrated doctor's actual awareness and conscious disregard of the life-threatening dangers of his treatment of patients].) As noted above, to sustain an implied malice murder conviction, there must be substantial evidence that Tseng subjectively appreciated the risk to her patients of her opioid prescription practices. Here, substantial evidence supports the jury's finding that Tseng acted with a subjective appreciation of the risks involved in her medical treatment of Nguyen, Ogle, and Rovero.

As a licensed physician, Tseng had expert knowledge of the life-threatening risk posed by her drug prescribing practices. She knew that the drugs she prescribed were dangerous and that the combination of the prescribed drugs, often with increasing doses, posed a significant risk of death. Tseng's experience and medical training regarding opioids and other controlled substances endowed her with special knowledge of those dangers. During the investigation of her practice, Tseng admitted to undercover DEA agents that she understood that the drugs she was prescribing were addictive and typically would only be prescribed to treat pain from cancer and broken bones. She knew that she was prescribing those drugs in high doses and in dangerous combinations to patients who did not suffer from those conditions.

Tseng also took other actions that showed her awareness of the danger of her prescribing practices. After larger pharmacies, such as CVS and Walgreens, contacted Tseng to raise questions about the lack of medical justification for her prescriptions, and ultimately refused to fill those prescriptions, Tseng sent her

18

patients to small "mom and pop" pharmacies which she knew would continue to fill her prescriptions. Moreover, although she knew some patients were also obtaining similar prescriptions from other doctors and were taking drugs in lethal combinations, Tseng did not contact those other doctors to determine which drugs other doctors had prescribed or in what doses and when; nor did she check the CURES database for that information. Rather, Tseng told patients—some of whom she knew were addicted to prescription pain medication—not to mix the drugs.

There is substantial evidence of Tseng's subjective awareness of the risk of death her prescribing practices posed to the three charged murder victims. Concerning Nguyen, the evidence showed that from his initial visit, Tseng knew that Nguyen was drug-seeking and that he was taking high doses of opioids prescribed by other doctors. Nonetheless, she failed to corroborate his complaints of pain and anxiety, contact his other doctors, or do the kind of physical examination required to determine whether a legitimate medical reason existed for prescribing the drugs he requested. Instead, Tseng prescribed to Nguyen opioids and sedatives, and when he returned two weeks later having used up all the medications, she simply wrote him refill prescriptions. According to Tseng, during the second visit, she told Nguyen that she would not write him a prescription for his medications "early" again. She failed, however, to discuss with him the severe health risks of those combined medications. After that, Nguyen returned almost every month until his death in February 2009 seeking more medication in higher doses. Tseng wrote him refill prescriptions without further inquiry into the need for those refills, let alone in higher doses. A reasonable jury could infer from this evidence that Tseng was aware Nguyen was abusing the opioids and sedatives she had prescribed, and that by continuing

19

to prescribe the drugs in greater amounts and stronger doses, Tseng acted in conscious disregard for his life.

In addition, even while Tseng was treating Nguyen, she learned of the deaths of other patients—Stavron, Latham, and Keeney—who had similar patient profiles. They, like Nguyen, were otherwise healthy, young men seeking prescriptions for controlled substances and willing to pay cash, who died of drug overdoses shortly after Tseng treated them. They also expressed vague complaints about pain and reported taking prescription opioids and sedatives. Tseng admitted she knew that many of these patients were drug-seeking and had presented with symptoms of drug addiction when she prescribed controlled substances to them. She told her receptionist that her patients were "druggies." She, nonetheless, continued to prescribe high doses of opioids, sedatives, and muscles relaxants without performing adequate physical examinations of these patients and without corroborating their claims of pain and prior injuries. When these patients returned for subsequent visits and sought to refill the prescriptions, Tseng complied and sometimes wrote them prescriptions for stronger medications, again with no medical justification.

Substantial evidence further supports that Tseng acted with implied malice when treating Ogle. At his first visit in March 2009, Ogle told Tseng that he was taking extremely high doses of OxyContin®—in amounts used to treat terminal cancer patients—and using heroin daily. Rather than investigate this report of Ogle's drug use and prior treatment, Tseng prescribed him 100 tablets each of Xanax® as well as methadone—a drug she knew she was not licensed or trained to prescribe. Ogle then returned twice in the next month having used all the medications Tseng had prescribed. During those visits, he informed Tseng that he had taken all the medications and wanted refill prescriptions, and

20

Tseng observed that Ogle was suffering from symptoms of withdrawal from drugs. Tseng did not, however, refer him to an addiction specialist. Instead, Tseng just wrote him refill prescriptions. From this evidence, and from the evidence that at the time Tseng was treating Ogle she was aware of the deaths of her patients Stavron, Latham, Keeney, and Nguyen, the jury could reasonably have found that Tseng acted with implied malice in treating Ogle.

Substantial evidence also supports that Tseng acted with implied malice in treating Rovero. By the time she prescribed drugs for Rovero in December 2009, Tseng knew that eight of her patients (Stavron, Latham, Keeney, Chambers, Gomez, Katnelson, Nguyen, and Ogle) had died shortly after she had prescribed the types of drugs Rovero sought. Even armed with this knowledge, she continued to prescribe dangerous drugs in conscious disregard for Rovero's life. Specifically, Rovero presented to Tseng as using extremely high doses of OxyContin®, Xanax®, and the muscle relaxant Soma® every day. Tseng did not, however, verify the doses or the types of medications that other doctors had previously prescribed to Rovero. Instead, Tseng substituted one brand of opioid (OxyContin®) for another (Roxicodone®) and prescribed Xanax® and Soma® in reduced doses, which, according to the evidence presented at trial, guaranteed Rovero would suffer from withdrawals and raised his potential for overdose and death.

Our conclusion that substantial evidence supports a finding of implied malice with respect to each of the charged murders is not unprecedented. Our research has uncovered three cases—a federal case applying New York law and cases from California and Michigan—in which appellate courts addressed the sufficiency of evidence to support convictions of second degree murder or similar

21

charges, requiring evidence of recklessness or conscious disregard of life, stemming from a licensed physician's treatment of a patient.

Thus, in *Einaugler v. Supreme Court of State of N.Y.* (2d Cir. 1997) 109 F.3d 836, a medical doctor was charged under the New York Penal Code with reckless endangerment and willful patient neglect in connection with the death of his patient. The prosecution presented evidence that he endangered his patient, who was in a nursing home, when he prescribed that she be fed through her dialysis catheter instead of her feeding tube, and then engaged in willful neglect by delaying the patient's hospitalization, despite being told by other doctors that prompt treatment of the patient in a hospital was necessary. (*Id.* at pp. 840-841.) Although the doctor was not charged with second degree implied malice murder, the reckless endangerment charge against him required proof, as in Tseng's case, of the doctor's subjective awareness of the danger of his treatment. (*Id.* at p. 840.)

After the state appellate court affirmed the doctor's conviction, the doctor filed a petition for a writ of habeas corpus in the federal district court challenging the sufficiency of the evidence supporting his conviction. In denying the petition, the district court observed "[t]he reckless endangerment charge required proof that [the doctor] had recklessly engaged in conduct that created a substantial risk of serious physical injury. [New York] Penal Law [section] 120.20. For [the doctor's] act to be reckless, he must have grossly deviated from a reasonable person's standard of conduct and consciously disregarded a substantial and unjustifiable risk. See [New York] Penal Law [section] 15.05." (*Einaugler v. Supreme Court of State of N.Y.*, *supra*, 109 F.3d at p. 840, italics omitted.) The district court concluded that the doctor's convictions were supported by "sufficient" evidence. The court observed that the doctor knew of the dire health condition in which

his directions had placed his patient, had been directed to hospitalize his patient immediately once she showed signs of distress, and was aware of the serious health risk if she was not transferred promptly. He nevertheless waited 10 hours before transferring her to a hospital. (*Ibid.*)

Our opinion in *People v. Klvana, supra,* 11 Cal.App.4th 1679 also supports our conclusion that substantial evidence supports the jury's finding of Tseng's implied malice. In that case, we affirmed a medical doctor's convictions of second degree murder for the deaths of nine infants. We concluded that a reasonable jury could have found implied malice to support the murder convictions based on the following evidence: The defendant repeatedly ignored obvious signs of medical distress in his patients during delivery; he advised parents not to take their children to the hospital despite clear indications of the need to do so; he induced vaginal births in inappropriate circumstances, after having been warned on numerous occasions that his treatment was dangerously substandard; and he continued to deliver babies despite the fact that his hospital privileges had been suspended because of substandard performance. (*Id.* at pp. 1704-1705.) Further paralleling the facts here, in *Klvana,* the prosecution presented evidence of an uncharged baby's death resulting from the doctor's treatment to support the doctor's subjective knowledge of the grave risks of his treatment practices. (*Ibid.*)

*People v. Stiller* (2000) 242 Mich.App. 38, 43 (*Stiller*), is also instructive. In *Stiller*, the Michigan appellate court affirmed the implied malice second degree murder conviction of a doctor who, for a four-month period, prescribed his patient high doses of hydrocodone unrelated to any rational medical treatment. (*Id.* at p. 43.) The patient then died from an overdose of drugs, including hydrocodone. (*Id.* at p 41.)

23

In challenging his murder conviction, the doctor argued that "there was no evidence that he actually instructed [his patient] to take a fatal dose of drugs." (*Stiller*, *supra*, 242 Mich.App. at p. 47.) The *Stiller* court rejected the doctor's argument: "[B]y prescribing huge quantities of medicine unrelated to any rational medical treatment and that had a possibility of interacting with other drugs he prescribed, defendant should have known that an overdose was likely to occur, and he therefore exhibited a wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm." (*Ibid*.) The court also supported its decision with evidence that pharmacies had warned the doctor about his dangerous prescribing practices, the doctor had prescribed very high doses of powerful drugs, and he had knowledge that there was no legitimate medical reason for his drug prescription for the murder victim. (*Id*. at pp. 43-45.) The same is true here.

Finally, even accepting Tseng's claim that investigators did not expressly inform her that she was directly responsible for the deaths of Nguyen, Ogle, Rovero, or other patients, her conduct, after learning of these deaths, demonstrated she was aware of the lethal consequences of her prescribing practices. For example, Tseng placed "alerts" in the patient files indicating that they died of suspected drug overdoses. She also altered patient records after she learned she was under investigation. From this evidence and other circumstantial evidence in the record, a jury could have reasonably found Tseng knew the cause of Nguyen's, Ogle's, and Rovero's deaths and of her role in their demise. In sum, substantial evidence supports the jury's findings of implied malice.

24

**B.** *Evidence of Causation*

Tseng argues substantial evidence did not support the finding that she caused Nguyen's and Rovero's deaths.[20] We disagree.

Concerning Nguyen, the coroner determined that the cause of his death was the combined effects of Opana® and Xanax®, both prescribed by Tseng. Nguyen also had small amounts of methadone in his system when he died. Tseng argues that the presence of methadone was an "unforeseeable intervening" cause that demonstrates she did not cause his death. Tseng's argument is unavailing because it asks us to reweigh the evidence, which we cannot do. (See *People v. Protopappas* (1988) 201 Cal.App.3d 152, 168 [appellate court will not reweigh the evidence and draw inferences which the jury rejected].)

Although "an 'independent' intervening cause will absolve a defendant of criminal liability[,] . . . the intervening cause must be 'unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.' [Citation.] On the other hand, a 'dependent' intervening cause will not relieve the defendant of criminal liability. 'A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is . . . normal and reasonably foreseeable . . . the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability.' " (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1523.)

Here, Tseng's medical expert opined that the amount of methadone in Nguyen's system was "pretty small" and alone would not have killed Nguyen. Tseng's expert and the coroner's

---

[20] On appeal, Tseng does not contest that there was substantial evidence of causation with respect to Ogle's death.

investigator agreed that the medications Tseng prescribed to Nguyen were contributing causes of his death. Thus, even if methadone played a role in Nguyen's death, the jury could have reasonably concluded that the presence of methadone was not an unforeseen, independent intervening event that would relieve Tseng of liability for Nguyen's death.

Likewise, there was substantial evidence that Tseng's actions were a proximate cause of Rovero's death. Tseng prescribed Rovero Roxicodone®, Soma®, and Xanax®. The coroner found that the cause of Rovero's death was the combined drug toxicity from alcohol and the drugs Tseng had prescribed. Evidence was also presented that the amount of alcohol in his system could not have been lethal. The jury could have reasonably inferred from this evidence that alcohol was not an independent intervening cause of Rovero's death.

## II. The Court Did Not Err in Admitting Evidence of the Six Uncharged Deaths of Tseng's Patients

Tseng contends the trial court erred in permitting the prosecution to present evidence of the uncharged deaths of Stavron, Latham, Keeney, Chambers, Gomez, and Katnelson. She argues that the trial court should have excluded this evidence under Evidence Code section 1101, subdivision (a), because the six patient deaths were not relevant for any purpose authorized by Evidence Code section 1101, subdivision (b). Tseng further asserts that the trial court should have excluded the evidence under Evidence Code section 352 because the undue prejudice from this evidence substantially outweighed its probative value and its admission also violated her due process rights. We disagree.

Under Evidence Code section 1101, subdivision (b), evidence that a defendant has committed a crime, civil wrong, or some other act is admissible to prove a material fact "such as motive, opportunity, intent, preparation, plan, knowledge, identity, [the]

26

absence of mistake or accident." (Evid. Code, § 1101, subd. (b); see *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.) The admissibility of prior acts evidence "turns largely on the question whether the uncharged acts are sufficiently similar to the charged offenses to support a reasonable inference of the material fact they are offered to prove." (*People v. Erving* (1998) 63 Cal.App.4th 652, 659-660.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) "On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

The trial court did not abuse its discretion in admitting evidence of the six uncharged deaths to prove Tseng's intent. This evidence was relevant to the issue of Tseng's subjective awareness of the dangerous consequences of overprescribing opioids and other controlled substances to patients whom she knew to be "drug-seeking" or suffering the symptoms of addiction.

The evidence showed that, over the course of a few years, Tseng was repeatedly made aware of the potentially lethal risks posed by her prescribing practices, yet she ignored those warnings. Prior to the charged deaths, Tseng had learned of the uncharged deaths of her patients—Stavron, Lathan, Keeney, Chambers, and Katnelson—from overdoses of the same or similar drugs she prescribed Nguyen, Ogle, and Rovero. Despite this knowledge, Tseng continued to prescribe Nguyen, Ogle, Rovero, and others these drugs in sometimes even higher doses without any medical justification for doing so. Her prescribing practices thus tended to show a conscious disregard for the lives of her patients, including the murder victims. Even if the investigators did not expressly inform Tseng that her treatment and prescription practices

27

caused the deaths of the uncharged patients, her knowledge of the uncharged patients' deaths after she prescribed powerful drugs with no medical justification for those prescriptions was circumstantial evidence of her subjective knowledge of risk to support an implied malice mental state. In short, evidence of her knowledge of the uncharged murders helped the jury assess Tseng's level of awareness of the risk in determining whether, at the time of the murders, she acted with conscious disregard for life. The evidence was therefore admissible under Evidence Code section 1101, subdivision (b).

Further, the trial court did not abuse its discretion under Evidence Code section 352 in admitting the uncharged crimes. Evidence of the uncharged deaths was highly probative on the key issue in the case—whether Tseng harbored implied malice— and was not substantially outweighed by its prejudicial effect. (See Evid. Code, § 352 ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice."].)

Finally, admission of uncharged crimes under Evidence Code sections 352 and 1101 did not violate Tseng's constitutional rights to due process, a fair trial, and a reliable adjudication. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289 [" ' "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights" ' "]; *People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

28

**III. Tseng Has Not Demonstrated Prejudicial Error in the Trial Court's Denial of Her Motion to Unseal the Affidavit in Support of the Warrant to Search Her Bank Accounts, or in Finding that the Warrant Was Supported by Probable Cause, Nor Has She Demonstrated any Miscarriage of Justice from Introduction at Trial of the Financial Information Obtained Through the Warrant**

Tseng argues that the trial court erred in failing to unseal the entire affidavit submitted in support of the warrant to search her financial records, and in failing to quash or traverse the warrant because it was not supported by probable cause. Tseng further asserts that these errors violated her constitutional rights.

### A. *Background*

When the forensic examiners imaged Tseng's computers, they discovered that the vast majority of Tseng's patients paid in cash and that Tseng deposited the cash into multiple accounts at more than a dozen banks. In addition, the clinic's receptionist, G.R., confirmed that Tseng required patients to pay for services in cash and that the clinic's cash revenue and the number of patients had increased dramatically since 2007. Investigators suspected that Tseng's motivation in issuing medical prescriptions was financial. They also suspected that Tseng might have engaged in other crimes, such as money laundering, although Tseng ultimately was never charged with any such crime.

Based on this information, on April 16, 2013, Sergeant Thomas Greep, an investigator for the Los Angeles County District Attorney's Office, prepared a search warrant for approximately 13 banks, requesting account information from multiple accounts held by Tseng and her husband. Sergeant Greep's affidavit supporting the search warrant was submitted under seal pursuant

29

to *People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*), because, according to the affidavit, if the information in the affidavit and attachments were made public, they would have compromised the investigation. The search warrant was issued, and the financial records were seized.

Thereafter, on April 29, 2013, Tseng filed motions to unseal the affidavit and to quash and traverse the search warrant. The trial court conducted an in camera, ex parte hearing under the procedures outlined in *Hobbs*. At the hearing, the trial court questioned Sergeant Greep about the basis of probable cause for the warrant and the representations he made in the affidavit. The court further examined him as to the justification for sealing the affidavit and the supporting documents. (*Hobbs, supra*, 7 Cal.4th at p. 976.)

The trial court observed that although sealing the affidavit may have been initially justified to protect the confidentiality and integrity of the investigation, much of the information in the affidavit, including the identity of the clinic's receptionist, G.R., had already been disclosed to the defense.[21] The prosecutor agreed, but also stated that some of the information—including the identity of some of the banks and the account information subject to seizure— had not been disclosed to the defense. The prosecutor also asserted that the investigation was not complete because some banks were

---

[21] We have reviewed the sealed documents and the transcript of the above-described in camera hearing. We observe that in addition to G.R.'s identity, it appears that the identity of three of the banks identified in the affidavit were no longer confidential by the time of the hearing. An employee of one of the banks had tipped off Tseng to the existence of the subpoena in the warrant and the DEA had already learned of the identity of two other banks from its earlier seizure of Tseng's and her medical corporation's records.

still producing records.  The prosecutor told the trial court that depending on what the investigation revealed, an asset forfeiture procedure might be brought and, therefore, he argued that the identity of the banks and accounts subject to the warrant should remain under seal to protect the integrity of the assets in the accounts.  Investigators feared that if Tseng became aware of the identity of all of the accounts subject to search, she might remove her funds from those accounts.

The trial court concurred that the information about the banks should remain under seal, but ordered unsealing the first seven pages of the affidavit that contained information already known to Tseng (except for part of the conclusion on the seventh page which remained sealed).[22]  The trial court also

_____

[22] The trial court ordered disclosed the following information: The DEA and the Medical Board had investigated Tseng's medical practice; the DEA warrant had revealed that Tseng and her husband had numerous bank accounts; Tseng and her husband purchased real property; G.R.'s statement that the clinic accepted cash; and Sergeant Greep's belief that probable cause existed that Tseng had violated Health and Safety Code section 11153, subdivision (a) (prescriptions written for no legitimate medical purpose).

The following information at the bottom of page seven of the affidavit remained sealed:  Tseng and her husband had 51 bank accounts and had purchased multiple real properties; and given the number of transactions and accounts, Sergeant Greep believed that Tseng and her husband were laundering their money in violation of section 186.10.

In September 2017, Tseng filed a motion in this court to unseal the warrant, the portions of the affidavit that remained sealed, and the transcript from the June 2013 in camera hearing in which the trial court held pursuant to *Hobbs* to consider Tseng's motion to quash and traverse.  In November 2017, this

denied the motion to quash, finding that the warrant was supported by probable cause, and denied the traverse, finding no basis to conclude that the warrant was based on falsities, misrepresentations, or omissions. After the trial court unsealed part of the affidavit, Tseng never renewed her motions or sought to suppress the evidence discovered pursuant to the warrant.

Tseng argues on appeal that the trial court should have ordered the entire affidavit unsealed because there was no justification for sealing the search warrant and the entire supporting affidavit in the first place. She argues that under *Hobbs*, the only legal basis for sealing a warrant is to protect the identity of a confidential informant. Tseng elaborates that the only witness identified in the warrant, G.R., was not a confidential informant and was already known to Tseng. In addition, noting that she was never charged with money laundering, Tseng maintains that the sealed information did not disclose a basis of probable cause to issue a warrant.

## B. *Analysis*

Pursuant to Evidence Code sections 1040 (privilege to refuse to disclose official information acquired in confidence), 1041 (the privilege to refuse to disclose the identity of a confidential informant), and 1042, subdivision (b) (protecting confidential information and an informant's identity in a warrant from disclosure) and *Hobbs, supra,* 7 Cal.4th at page 971, all or part of a search warrant may be sealed or redacted to protect official confidential information or the identity of a confidential informant. (*Ibid.*; *People v. Galland* (2008) 45 Cal.4th 354, 363-364 (*Galland*);

court ordered the unsealing of the entire affidavit, but denied the request to unseal the warrant; in December 2017, we ordered that the transcript from the June 2013 *Hobbs* hearing be unsealed.

32

*People v. Heslington* (2011) 195 Cal.App.4th 947, 955-956
(*Heslington*).)  To preserve a defendant's right to reasonable
access to information that might form the basis for a challenge
to the validity of a warrant, and to strike a fair balance between
the privileges in Evidence Code sections 1040 and 1041, a trial
court must follow certain procedures when a defendant moves
to unseal, quash, or traverse a sealed warrant.[23]  (*Hobbs, supra,*
7 Cal.4th at pp. 962, 971–975; *Galland, supra*, 45 Cal.4th at p. 364;
*Heslington, supra,* 195 Cal.App.4th at pp. 955–958.)

On appeal, we review Tseng's claims de novo.  (See *Hobbs,
supra,* 7 Cal.4th at pp. 975, 977.)  We review *Hobbs* error under
the state law harmless error standard.  (See *Heslington, supra,*
195 Cal.App.4th at pp. 960-961 [applying a state law standard of
prejudice to a claim of error under *Hobbs*].)

The trial court acknowledged that Tseng was aware of
G.R.'s identity and thus protecting the identity of a confidential
informant did not justify denying Tseng's request to unseal the

---

[23] The trial court must first conduct an in camera hearing
to determine whether there are sufficient grounds for maintaining
the confidentiality of the informant's identity or the information
sought to remain sealed.  (*Galland, supra,* 45 Cal.4th at p. 364;
*Hobbs, supra,* 7 Cal.4th at p. 972; *People v. Martinez* (2005)
132 Cal.App.4th 233, 240–241.)  Once the affidavit is found to have
been properly sealed, the court must determine whether there
was " ' "a fair probability" that contraband or evidence of a crime
would be found in the place searched pursuant to the warrant'
(if the defendant has moved to quash the warrant) or 'whether
the defendant's general allegations of material misrepresentations
or omissions are supported by the public and sealed portions of
the search warrant affidavit . . .' (if the defendant has moved to
traverse the warrant)."  (*Galland, supra,* 45 Cal.4th at p. 364;
*Hobbs, supra,* 7 Cal.4th at pp. 974–975; *Heslington, supra,*
195 Cal.App.4th at p. 957.)

entire affidavit. In addition, other information in the sealed affidavit was no longer confidential, i.e., the government's awareness of at least three of the banks that were the subject of the search warrant. Moreover, presumably Tseng was aware of her bank account information, such as her bank account numbers.

The prosecutor informed the trial court that the People were seeking to keep a portion of the affidavit sealed to shield that the People were exploring potential additional charges related to how Tseng used her bank accounts to hide the cash she received from her medical practice. The prosecutor sought to keep this information sealed to prevent Tseng from removing the funds from those accounts while the People were considering whether to bring any such additional charges against Tseng. Acknowledging the prosecutor's concerns, the trial court ordered that those sections of the affidavit relating to the ongoing confidential investigation remain sealed.

Tseng argues that the *Hobbs* sealing procedures apply *only* to protect the identity of confidential informants. We note that the Evidence Code states that an informant's identity and other *confidential official information* may remain under sealed. (See Evid. Code, § 1042, subd. (b) [providing that when a search warrant is valid on its face, a public entity bringing a criminal proceeding may establish the search's legality without revealing to the defendant any official information or an informant's identity], italics added.) Similarly, in dicta, the *Heslington* court observed that "[b]y statutory privilege, public entities may refuse to disclose *official information* and an informant's identity when disclosure is against the public interest." (*Heslington, supra,* 195 Cal.App.4th at pp. 955-956, italics added.) Arguably, the fact of the People's confidential investigation into potential money laundering and similar charges against Tseng could constitute such official

information.  (See *People v. Jackson* (2003) 110 Cal.App.4th 280, 287 [holding that "[o]ngoing investigations fall under the privilege for official information," and affirming the prosecution's refusal to disclose information about an ongoing police investigation based on Evidence Code section 1040]; see also *People v. Otte* (1989) 214 Cal.App.3d 1522, 1531, fn. 4 [observing that the definition of "official information" subject to the privilege includes "more sources of information and the different methods of its acquisition than that furnished by the informants"].)

We need not, however, resolve this issue. Even assuming arguendo that the court erred in failing to unseal the entire affidavit, any such error was not prejudicial as to the *Hobbs* proceedings or the trial itself.

First, Tseng suffered no prejudice from the court's order sealing the information about the government's investigation of the three banks (and Tseng's accounts) because he had already learned the information from other sources.

Second, as to the other information in the affidavit, upon our review of the sealed portions of the affidavit, we have concluded there was no reasonable probability that Tseng would have prevailed on her motion to quash or traverse had the entire affidavit been unsealed.  Concerning the motion to traverse, the sealed portion of the affidavit contained no inconsistencies or insufficiencies indicating that the affiant included a false statement made "knowingly and intentionally, or with reckless disregard for the truth" that was "necessary to the finding of probable cause." (*Franks v. Delaware* (1978) 438 U.S. 154, 155-156.)  Thus, the sealed information would not have supported Tseng's motion to traverse.

With regard to the motion to quash, we also agree with the trial court's finding that the affidavit detailed probable cause for

35

issuance of the warrant. Tseng's claim to the contrary is based solely on the sealed portion of the affidavit. Aside from the fact that the sealed affidavit contained additional evidence of probable cause, the information in the first seven pages of the affidavit, which was unsealed and disclosed to Tseng the factual basis for the warrant—including that Tseng's practice was under investigation for its prescribing practices by state and federal authorities, that Tseng had numerous bank accounts, and Tseng accepted cash payments for service—was sufficient by itself to make the requisite showing of probable cause. Tseng's argument downplays this information and ignores the reasonable inferences of guilt of the violation of Health and Safety Code section 11153, subdivision (a) (prescriptions written for no legitimate medical purpose) that was being investigated.

Finally, Tseng claims that the failure to unseal the entire affidavit violated her constitutional rights to due process and the effective assistance of counsel. Tseng's motion to unseal the affidavit was a discovery motion. (See *People v. Navarro* (2006) 138 Cal.App.4th 146, 169-170 [characterizing motions to disclose information in sealed affidavits supporting search warrants pursuant to *Hobbs* as "discovery" procedures].) "It is settled that an accused must demonstrate that prejudice resulted from a trial court's error in denying discovery." (*People v. Memro* (1985) 38 Cal.3d 658, 684, overruled on other grounds by *People v. Gaines* (2009) 46 Cal.4th 172; accord, *People v. Clark* (1992) 3 Cal.4th 41, 133, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) Tseng has not done so. She does not explain how the part of the affidavit that remained sealed could have assisted her in challenging the warrant and she never moved to suppress the evidence obtained in the search even after the trial court unsealed portions of the affidavit and warrant.

36

Tseng has not shown she suffered a miscarriage of justice under the state law standard of prejudice. Evidence of Tseng's finances may have suggested a possible motive for the crimes underlying her convictions. But motive was not an element of those crimes. Furthermore, even absent this financial evidence, there was overwhelming evidence of Tseng's knowledge of risk and reckless indifference to her patients' lives in her prescribing practices to support her convictions, as we have detailed above. Thus, viewed from any vantage point in the proceedings, any error in applying *Hobbs* was harmless.[24]

## IV. Tseng Has Not Demonstrated that the Prosecution Committed Prejudicial Misconduct Warranting Reversal

Tseng complains that the prosecution committed prejudicial misconduct on two separate occasions during the trial by eliciting, in violation of a court order, information about the deaths of two victims of the unlawful prescription charges. She contends that this prosecutorial misconduct denied her due process.

### A. *Background*

#### 1. *Nicholas Mata*

During the trial, John Mata testified that his son was one of Tseng's patients, Nicholas Mata, the victim in count 14, an unlawful prescription charge. The prosecutor asked John Mata

---

[24] Also unavailing is Tseng's general attack on the constitutionality of the *Hobbs* procedure. Our Supreme Court has rejected such an attack. (*Hobbs*, *supra*, 7 Cal.4th at pp. 971-975 [authorizing procedures the trial court followed here and rejecting that those procedures violate due process].) We are bound by *Hobbs*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

the date of his son's death; he responded that his son died on May 14, 2010. Tseng's counsel objected, reminding the trial court that under a prior order, the prosecution was prohibited from eliciting evidence of Nicholas Mata's death because the death had occurred *after* the last charged death. The prosecution conceded the error. The trial court informed counsel that it could instruct the jury to disregard the evidence of the death, but was concerned that any instruction might highlight the death. The trial court asked the prosecution to remind the witness not to mention his son's death. Thereafter, at the conclusion of the direct examination, Tseng's counsel requested that the trial court strike the testimony of John Mata and dismiss count 14. The trial court denied the request, finding the misconduct was not prejudicial and did not warrant dismissal of the charge. The trial court, however, admonished the jury that Tseng was not being charged with Nicholas Mata's death and that John Mata's testimony was relevant only to the unlawful prescribing count.

### 2. *Michael Huggard*

The prosecution elicited testimony from the doctor who conducted the autopsy of Huggard, the victim in count 11 (an unlawful prescription charge), that Huggard had died. Tseng's counsel complained that "this is evidence of another instance of prosecutorial misconduct. . . . Huggard . . . passed away after the other three counts [Nguyen, Ogle, and Rovero], and his death was not to be mentioned. They were only limited to the overdose." The prosecutor responded that Huggard was "in the window" because he had died in 2009. Tseng's counsel moved for a mistrial. The court instructed the prosecution to determine Huggard's date of death.

After the lunch break, the prosecution stated that Huggard had died in 2010 and that they had been mistakenly operating

38

under the assumption that Huggard had died in 2009.  Thereafter, the trial court denied the mistrial motion and subsequently admonished the jury to disregard the testimony of Huggard's death and to consider only the evidence about the unlawful prescription allegation.  At the close of the case, the trial court also instructed the jury not to "consider for any purpose any offer of evidence that was rejected or any evidence that was stricken by the court; treat it as though you had never heard it."

Before this court, Tseng argues the trial court's instructions were insufficient to cure the harm and that the trial court should have stricken John Mata's testimony, dismissed count 14 after the first instance of misconduct, and granted Tseng's mistrial motion after the reference to Huggard's death.

### B.    *Analysis*

The Attorney General concedes, and we agree, that the prosecution's questions referencing Mata's and Huggard's deaths constituted prosecutorial misconduct because the trial court had previously ordered that this evidence not be presented to the jury. (See *People v. Bell* (1989) 49 Cal.3d 502, 532 [holding that the deliberate asking of questions and calling for inadmissible and prejudicial answers is misconduct].)

We conclude, however, that the prosecution's actions did not violate Tseng's due process rights and did not warrant reversal. The prosecution's misconduct was not so pervasive as to infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)  Furthermore, given the evidence of the other overdose deaths that was properly admitted, "it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of any alleged misconduct." (*People v. Turner* (1994)

39

8 Cal.4th 137, 194, abrogated on another ground by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) We assume the jury followed the trial court 's admonitions, which further obviated any prejudice. (*People v. Jones* (1997) 15 Cal.4th 119, 168, overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800.)

In addition, the trial court did not abuse its discretion in denying the motion for a mistrial. "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) We conclude that the trial court did not abuse its discretion here, particularly given that the jury had already heard evidence about the nine uncharged deaths of Tseng's patients.

## V.     The Trial Court Did Not Err in Reopening Closing Arguments

Tseng argues that the trial court's decision to reopen the argument during deliberations coerced the jury to return a guilty verdict on the murder charges and thus violated her due process rights. We disagree.

### A.     *Background*

On the eighth day of deliberations, the jury submitted two questions to the trial court: "Do we have to be unanimous in not guilty of second degree to deliberate on manslaughter? [And] [w]hat if we are split on second degree?" After consulting with, and obtaining the agreement of the parties, the court instructed the jury with CALJIC No. 17.49 [Use of Multiple Verdict Forms— Implied Acquittal—First], which informed the jury in pertinent part: "Since the lesser offenses are included in the greater, you

40

are instructed that if you find the defendant guilty of the greater offenses, you should not complete the verdicts on the corresponding lesser offenses, and those verdicts should be returned to the court unsigned by your foreperson.  If you unanimously find the defendant not guilty of the felonies charged, you then need to complete the verdicts on the lesser included offenses by determining whether the defendant is guilty or not guilty of the lesser included crimes, and the corresponding verdicts should be completed and returned to the court signed by your foreperson."  The court also reminded the jurors to consider the evidence about each murder count separately and carefully review all of the evidence.  The jury resumed deliberations.

The next day, outside the jury's presence, the trial court indicated it had planned to instruct the jurors (pursuant to defense counsel's request) with CALJIC No. 17.10 [Conviction of Lesser Included or Lesser Related Offense—Implied Acquittal— First] to augment the instruction it had given the previous day.  The trial court explained it had also decided to grant the parties' requests to argue for 10 additional minutes "regarding that specific issue of greater versus lesser" offense.  The trial court also acknowledged that the bailiff had informed the court that jurors stated they "had resolved the issue that was in their question."  The trial court said it was inclined to proceed as it had previously planned.

Tseng's counsel objected, pointing out that the trial court was permitted to reopen argument only if the jury is "deadlocked."  The trial court responded:  "It appears that they're deadlocked based on their questions yesterday, or at least they were divided, and so the court can allow it under those circumstances, as well."

The jurors entered the courtroom, and the trial court instructed in accordance with CALJIC No. 17.10, which informed them that "the court cannot accept a guilty verdict on a lesser crime

41

unless you have unanimously found the defendant not guilty of the charged greater crime," and then returned the jurors to the jury room to decide whether further argument would be helpful.  Shortly thereafter, the jury sent the trial court the following request:  "We would like to listen to the additional argument!"  The jury returned to the courtroom and heard 10 minutes of argument from each side, focusing on the issue previously identified by the jury.  The jury continued deliberations for the remainder of that day, and at the end of the following day—the 10th day of deliberations—the jury reached its verdicts.

## B.  *Analysis*

When faced with questions from a jury, including a question referencing an impasse, "a court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must at least consider how it can best aid the jury." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*), italics omitted.)  A further argument is permissible where a jury reports it has reached an impasse in deliberations.  (*People v. Young* (2007) 156 Cal.App.4th 1165, 1170; see Cal. Rules of Court, rule 2.1036(b)(3).)

Here, the jury initially indicated that it was "split on second degree."  The jury's subsequent communications indicated it had resolved one of the questions coupled with its desire to hear additional argument.  Taken together, the jury's inquiries demonstrated that it was struggling with its deliberations and had reached an impasse.  Under these circumstances, we conclude that the trial court's decision to allow the parties to reopen argument to assist the jury in its deliberative process was not an abuse of discretion.  (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 129, fn. 10 [further argument is permissible "when a jury expresses confusion and an impasse in its deliberations related to the governing law and

42

instructions, particularly in light of the trial court's broad discretion to alter the sequence of trial proceedings"].)

By asking if additional argument might be helpful, the trial court did no more than ascertain the reasonable probability of resolving the impasse and a means by which that might be accomplished. Further, the procedure was neutral, giving each side a brief opportunity to argue. The trial court did not make any coercive remarks or give any coercive instructions. It did not urge the jurors to reach an agreement. We see no abuse in the court's exercise of its discretion. Furthermore, even if the trial court erred in allowing further argument, there was no reasonable probability that Tseng suffered prejudice as a result of that decision. (See *Beardslee, supra,* 53 Cal.3d at pp. 97-98 [a court's error in resolving concerns or questions from the jury during the deliberation reviewed for harmless error under state law prejudice standard].)

## VI.   The Imposition of Consecutive Sentences on Counts 1 and 4 Did Not Violate Section 654

Tseng argues that the consecutive sentences imposed on her second degree murder convictions for count 1 (murder of Nguyen) and count 4 (murder of Rovero) violated section 654. She maintains that the trial court should have run those sentences concurrently with the sentence on her second degree murder conviction for count 2 (murder of Ogle).

Pursuant to section 654, subdivision (a):  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (*Ibid*.) Section 654 precludes multiple punishments not only for a single act but also for an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.)

43

Tseng contends that because the prosecution's theory at trial was that Tseng committed the charged crimes pursuant to a common pattern of criminal conduct of overprescribing drugs to her patients, and pursuant to a single intent and objective of enriching herself, separate sentencing for the murder convictions was impermissible under section 654. Even if we were to consider that all of the murders were committed with a single generalized intent and objective, separate sentencing would still be permissible under section 654.

Here, the crimes involved separate murder victims, Nguyen, Ogle, and Rovero and occurred months apart. Acts of violence against separate victims at different times may be separately punished. (See, e.g*., People v. Price* (1991) 1 Cal.4th 324, 492 [section 654 does not preclude separate punishments for crimes of violence committed against separate victims]; *People v. Kwok (*1998) 63 Cal.App.4th 1236, 1255-1256 [where the offenses are temporally separated in such a way as to afford the defendant an opportunity to reflect and to renew his or her intent before committing the next one, section 654 does not apply].) Accordingly, the second degree murder convictions of Nguyen, charged in count 1, and Rovero charged in count 4, were not subject to section 654.

## VII.  The Cumulative Error Doctrine Does Not Apply

Tseng contends even if the alleged individual errors addressed above were harmless when viewed in isolation, the cumulative effect of the errors warrants reversal of her convictions. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]  When the cumulative effect of errors deprives the

44

defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  Because Tseng has not demonstrated that the trial court committed any error, the "cumulative" error doctrine does not apply.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


ROTHSCHILD, P. J.

We concur.


CHANEY, J.


BENDIX, J.